## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| JAMES C., individually and on behalf of M.C., a minor,<br><br>**Plaintiff,**<br><br>v.<br><br>**ANTHEM BLUE CROSS AND BLUE SHIELD, and the CFA INSTITUTE KEYCARE MEDICAL PLAN,**<br><br>**Defendants.** | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>**Case No. 2:19-cv-38**<br><br>**Judge Clark Waddoups** |

Before the court are cross motions for summary judgment from Defendants Anthem Blue Cross and Blue Shield and CFA Institute Keycare Medical Plan ("Anthem" or "Defendants") (ECF No. 73) and Plaintiffs James C. and his minor daughter M.C. ("M" and together with James C., "Plaintiffs") (ECF No. 74). This action arises out of Anthem's denial of payment for residential treatment services that M received. The parties' motions have been fully briefed, and the court heard argument on the same at a hearing held on June 7, 2021. Having reviewed the pleadings and submitted materials and considered the arguments of counsel, and for the reasons stated herein, the court enters this order **GRANTING** Defendants' Motion for Summary Judgment and **DENYING** Plaintiffs' Motion for Summary Judgment.

### LEGAL STANDARD

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(A). A material fact is one that may affect the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of

showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Id*. The court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001). "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

In an ERISA case, when both parties move for summary judgment, the parties "stipulate that no trial is necessary," and "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility of benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citations and quotations omitted)).

## UNDISPUTED FACTS

Before the court is the Administrative Record—the information that Anthem considered in assessing, and ultimately denying, M's claim for her treatment (the "Record"). Also before the court are certain Care Criteria used by Anthem. (ECF No. 89-5). The Record is comprised of 2952 pages (*see* ECF No. 72) and is of record at ECF Nos. 72-1 through 72-64 and ECF Nos. 89-1 through 89-4. It is the "sole" basis for the court's "factual determination of eligibility of benefits." *LaAsmar*, 605 F.3d at 796. However, it also appears to be incomplete, as it lacks records from the first fifteen (15) and last forty-five (45) days of M's treatment.[1]

---

[1] *See infra* Section I.

## Background

1.      M is the minor child of Plaintiff James C. (Amend. Compl., ECF No. 39 at ¶ 1).

2.      At all times relevant to this action, James C. was a participant in the CFA Institute KeyCare Medical Plan (the "Plan"), a self-funded employee welfare benefits plan administrated by defendant Anthem Blue Cross and Blue Shield ("Anthem" and together with the Plan, "Defendants"), the third-party claims administrator for the Plan. (*Id*. at ¶¶ 2–3). At all times relevant to this action, M was a beneficiary of the Plan. (*Id*. at ¶ 3).

3.      On June 28, 2016, M was admitted to Maple Lake Academy, a licensed residential treatment facility located in Utah ("Maple Lake"). M remained at Maple Lake until she was discharged on or about November 19, 2017.

4.      Anthem denied coverage M's treatment at Maple Lake (the "Treatment") in full on the basis that the same was not medically necessary. (*See* R502–03, ECF No. 72-7).

## Policy Information

5.      Since M's treatment spanned the 2016 and 2017 calendar years, it was governed by two different iterations of the Plan—the 2016 version (ECF No. 72-1) and the 2017 version (ECF No. 72-2). Because M's Treatment was denied from the time that she was admitted to Maple Lake, the court finds that the version of the Plan that was effective at the time she was admitted (the 2016 version) is controlling. As such, for purposes of this opinion, "the Plan" will refer to the 2016 version.[2]

---

[2]  To the extent that changes made to the 2017 version of the plan are relevant to the issues before the court, and its analysis of the same, the court will specifically note that the 2017 version of the plan is being discussed by referring to the same as the "2017 Plan." "The Plans" refers to both.

6.    The Plan provides potential coverage for mental health treatment.  (R32–33, ECF No. 72-1).  Inpatient services, outpatient services, and residential treatment are all potentially covered by the Plan.  (*Id.*).

7.    The Plan defines "Residential Treatment" for mental health treatment as "specialized 24-hour treatment in a licensed Residential Treatment Center or intermediate care Facility [that] offers individualized and intensive treatment and includes: Observation and assessment by a psychiatrist weekly or more often, [and] [r]ehabilitation, therapy, and education."  (R32–33, ECF No. 72-1).  Under the Plan, "[w]hether care is considered residential will be determined based on factors such as whether you receive active 24-hour skilled professional nursing care, daily physician visits, daily assessments, and structured therapeutic services."  (R49, ECF No. 72-1).

8.    At all relevant times, Maple Lake was a licensed Residential Treatment Center.  M's stay at Maple Lake was considered "Residential Treatment" under the Plan.

9.    Under the Plan, treatment and services, including Residential Treatment, are only covered if they are "medically necessary."  (*See* R48, ECF No. 72-1).

10.   The Plan grants Anthem the "sole discretion" to determine whether "benefits for services and supplies [are] medically necessary."  (*Id.*).

11.   To make determinations as to medical necessity, Anthem has adopted clinical guidelines.  (*See e.g.*, R2796, ECF No. 72-56 ("This document provides medical necessity criteria for levels of care relating to psychiatric disorder treatment and psychiatric outpatient treatment (including treatment provided by a clinician licensed at the independent practice level) and medication management.")).[3]

---

[3] The 2017 Plan contains the following language: "[w]e use our clinical coverage guidelines and other applicable policies and procedures to help make our medical necessity decisions. . . . Coverage and

12.     Anthem's clinical guidelines are developed to be "objective and based on medical evidence for certain new medical services and/or procedures or for new uses of existing services and/or procedures." (R2912, ECF No. 89-1). They are developed by the "Office of Medical Policy & Technology Assessment," which is "a multiple disciplinary group including physicians from various medical and behavioral health specialties, clinical practice environments and geographic areas." (*Id*.). In reaching decisions regarding medical necessity, developers may rely on internal policies, "[c]ollated results of electronic literature searches" or independent technology evaluation programs and materials published by professional associations such as "[t]echnology assessment entities; [a]ppropriate government regulatory bodies; and [n]ational physician specialty societies and associations." (R2912–13, ECF No. 89-1).

13.     Anthem reviews these clinical guidelines, as well as its policies, "on an annual basis to look for new peer reviewed medical studies or other authoritative sources that have been published that could impact the policy's determination as to the medical necessity or investigational nature of the service." (R2951, ECF No. 89-4).

14.     Relevant to M's Treatment is Anthem's "Clinical UM Guideline" for "Psychiatric Disorder Treatment." (R2796–811, ECF No. 72-56).[4] That guideline provides that the medical necessity of residential treatment for mental health hinges on the "severity of illness" and specifically provides that:

> "Residential treatment center is considered medically necessary when the member has all of the following:
> 1. The member is manifesting symptoms and behaviors which represent a deterioration from their usual status and include either self injurious or risk taking

clinical guidelines reflect the standards of practice and medical interventions identified as proper medical practice. We reserve the right to review and update these clinical coverage guidelines from time to time." (R121, ECF No. 72-2). No such language was included in the 2016 Plan.

[4] The Record contains numerous versions of this guideline, as it was revised over time. (*See* ECF Nos. 72-52 through 72-56). Because M's treatment at Maple Lake was denied in full, the court finds that the version that was effective at the time she was admitted (ECF No. 72-56) is controlling.

behaviors that risk serious harm and cannot be managed outside of a 24 hour structured setting or other appropriate outpatient setting; **AND**
2. The social environment is characterized by temporary stressors or limitations that would undermine treatment that could potentially be improved with treatment while the member is in the residential facility; **AND**
3. There should be a reasonable expectation that the illness, condition or level of functioning will be stabilized and improved and that a short term, subacute residential treatment service will have a likely benefit on the behaviors/symptoms that required this level of care, and that the member will be able to return to outpatient treatment.

(R2797–98, ECF No. 72-56 (emphasis in original)).  The guideline concludes that "[r]esidential treatment center is considered not medically necessary when the above criteria are not met."

(*Id*.).

### **M's Treatment**

15.     M was admitted to Maple Lake on June 28, 2016.

16.     The Record does not contain any medical records for M that proceeded her admission to Maple Lake.  (*See* R1788, ECF No. 72-50 (noting that M's parents "did not submit very much written information regarding [M's] past treatments")).[5]  Rather, her admission to Maple Lake was based upon her parents' representations that M:

     a.     "has not attended school since March 2016" (R2586, ECF No. 72-50);

     b.     is "difficult at home" (*id*.);

     c.     "did not follow house rules and often acted out against them" (*id*.);

     d.     "spent a lot of time in her room and did not interact with the family" (*id*.);

     e.     had attended "an out-patent therapeutic day school for a short time," where the "primary focus was therapeutic with some academics" (*id*.);

---

[5]  It is unclear whether such records were never submitted to Maple Lake or whether they were omitted from the Record.   *See infra* Section I; *see infra* Note 9.

f.      had during the past year been admitted to St. Claire's Hospital for a short time for being physically threatening towards her mom" (*id*.);

g.      "has become physically threatening towards her mom" (R2587, ECF No. 72-50);

h.      "has become defiant with her parents and refuses to follow through with various requests and tasks given to her by her parents" (*id*.);

i.      has "unpredictable" "mood and behavior" (*id*.);

j.      has "a history of acting out physically and emotionally towards her family" (*id*.);

k.      "struggles socially" (*id*.); and

l.      "[i]n the last couple of months . . . did . . . some self harming" in the form of "superficial cuts on her arms and upper legs" (*id*.). M's parents were unable to confirm or deny M's representation that she "is no longer cutting" (*id*.).

17.      At some point between her admission and July 20, 2016, M underwent a psychological evaluation (the "Psychological Evaluation"). (*See* R2661, ECF No. 72-50 (indicating that M's "initial psych evaluation" had been completed before July 20, 2016)). There is not a copy of, or report summarizing, the Psychological Evaluation in the Record.[6]

18.      On August 9, 2016, Maple Lake prepared a Master Treatment Plan for M (the "MTP"). (*See* R2470–76, ECF No. 72-50). The MTP stated that M had been diagnosed with "Social (pragmatic) communication disorder" (DSM5 Code 315.39 (F80.89)) and "Parent-child relational problem" (DSM5 Code V61.20 (F62.820)). (R2470, ECF No. 72-50).

---

[6] *See infra* Section I; *see infra* Note 9.

19.     The MTP also listed certain "limitations" that afflicted M, and recognized that she "[s]truggles with mood, behavioral difficulties, anger problems, denial regarding treatment issues, lack of concern for rules and authority, dual diagnosis, poor grades, history of poor school attendance."  (*Id.*).  It then it identified the two "Master Problems" that M was facing—"Social (Pragmatic) Communication Disorder" and "Parent-child relational problem"—and set "Long Term/Discharge/Graduation Goals" and "Short Term Objectives" for each.  (R2471–76, ECF No. 72-50).

20.     Regarding her Social (Pragmatic) Communication Disorder, the goal of M's Treatment was to get her to: "learn strategies and skills to help increase her social skills," "show increased ability to regulate her attention," and "learn to identify the symptoms of her diagnosis." (R2472, ECF No. 72-50).

21.     Regarding her "Parent-child relational problem," M's Treatment was designed to help her "relate to her parents in an honest, respectful, and responsible manner," "be open to receiving [sic] feedback from her parents," and "have healthier communication with her parents."  (R2475, ECF No. 72-50).

22.     To reach these short and long term objectives, the MTP provided that M would, among other things, engage in "daily group therapy"; participate in daily chores and exercise; complete "[p]eriodic writing assignments"; have "weekly family and individual therapy; and "participate in social/group/leisure education/experiential family sessions at least 4 times weekly."  (*See* R2472–76, ECF No. 72-50).

23.     On July 27, 2016, a "Psychosocial Assessment" was prepared for M.  (R2586–88. ECF No. 72-50).  This Psychosocial Assessment repeated the diagnosis of "Parent-child relational problem" contained in the MTP but replaced the "Social (pragmatic) communication

disorder" diagnosis with a diagnosis of "Autism spectrum disorder – Level 1" (DSM5 Code 299.00 (F84.0)). (R2586, ECF No. 72-50).

24. Thereafter, on or about November 10, 2016, a "Recreation Therapy Assessment" was completed for M. (R2187–90, ECF No. 72-49). That assessment listed three diagnoses: "Autism Spectrum Disorder", "R/O Mood Disorder," and "Oppositional Defiance Disorder." (R2187, ECF No. 72-49).

25. The MTP was modified by a Treatment Plan Review dated March 22, 2017. (R1655–56, ECF No. 72-47). That Treatment Plan Review listed three diagnoses for M: "Major depressive disorder, Single episode, Unspecified" (DSM5 Code F32.9), "Parent-child relational problem", and ""Social (pragmatic) communication disorder." (R1655, ECF No. 72-47). It also added to M's "Master Problem List," as of February 22, 2017, the problem of "Major Depressive Disorder." (R1655, ECF No. 72-47).

26. The Treatment Plan Review also provided the following "Justification for Continued Treatment": "[M] has a steep growth curve before she is competent in her ability to self-regulate, empathize with the concerns of authority and society in general, and to create a stable and healthy identity that will provide some independence for her self and interdependence with her family members. Residential treatment provides a stable and supportive environment that broadens her opportunities to form healthy attachment, learn to cope with stressors, and relate in a socially appropriate manner to others." (R1656, ECF No. 72-47).

27. The Treatment Plan Review was subsequently updated on June 14, 2017, but the three diagnoses, the Master Problem List, and the "Justification for Continued Treatment" were not changed or added to. (*See* R1161–63, ECF No. 72-46).

28. Pursuant to the MTP, M participated in frequent group, individual, and family therapy sessions. Following her individual and family therapy sessions, Maple Lake staff would complete a "Clinical Progress Note." (*See e.g.*, R2384, R2389, ECF No. 72-50). The Record contains approximately 122 of these Clinical Progress Notes. The "Assessment" portion of the Clinical Progress Note form had a prompting for staff to address/add information regarding any "Risk of harm to self or others" that M was displaying. (*See e.g.*, *id.*).[7]

29. Periodic "Treatment Team Notes" were also completed by Maple Lake staff to provide updates and/or summaries of M's treatment, status, and progress. (*See e.g.*, R2479, ECF No. 72-50).

30. When M was admitted to Maple Lake, she was taking 50mg of Seroquel (aka Quetiapine), which she reported was prescribed to help with sleeping. (R2539, ECF No. 72-50; R2102, ECF No. 72-49).

    a. M's dosage of Seroquel was ordered to be increased to 75 mg on May 18, 2017, after she reported "feeling like her seroquel has not been quite as effective in helping her sleep as well, nor with her mood during the day." (R1407, ECF No. 72-47). But M's mother subsequently "opted against increasing the Seroquel dosing." (R1353, ECF No. 72-46; *see also* R1294, ECF No. 72-46; R1263, ECF No. 72-46).

31. Treatment Team Notes dated November 16, 2016 state that M has been prescribed antidepressants but do not detail what was prescribed. (R2079, ECF No. 72-49). It appears that the prescription was for Celexa (aka Citalopram). (*See* R2723, ECF No. 72-51).

---

[7] Approximately 10 of the 122 Clinical Progress Notes in the Record do not contain this prompting. (*See e.g.*, R2612, ECF No. 72-50).

a.       Medical Director Jason Anderson noted that he "would like to consider increasing the citalopram dose to 30mg/day." (R1353, ECF No. 72-46). M's mother "refused" to allow such an increase. (R1220, ECF No. 72-46).

b.       On November 29, 2016, Jason Anderson wrote in a "Doctor's Progress Note" that M "appears quite depressed" and recommended a "trial of an antidepressant." (R2102, ECF No. 72-49). In response, M said she would discuss the mater "with her mother and therapist." (*Id.*). It is unclear if this trial was related to the Celexa or whether it ever ocurred.

32.       The March 22, 2017 Treatment Plan Review noted that M was "taking medication for depression and a mood stabilizer." (R1655–56, ECF No. 72-47). When the Treatment Plan Review was updated on June 14, 2017, this language was repeated, and it was noted that "Psychiatrist has ordered medication increase but [M's] Mother has refused." (R1161–63, ECF No. 72-46).

33.       The Record contains the following facts/incidents that are relevant to whether M posed a risk of serious harm:

a.       As reported in the Psychosocial Assessment, M's parents informed Maple Lake that she: is "difficult at home;" had been admitted to a hospital for a short time for being physically threatening towards her mother; "has become physically threatening towards her mom"; has "unpredictable" "mood and behavior"; has "a history of acting out physically and emotionally towards her family"; and has done "some self harming" in the form of "superficial cuts on her arms and upper legs," which they do not know if she engaged in. (*See* R2586–87, ECF No. 72-50).

b.       M's mother also reported to Maple Lake that M "has not been violent." (R2189, ECF No. 72-49).

c.      On August 13, 2016, M had a minor altercation where another student pushed her and she pushed back. (R2558–59, ECF No. 72-50; *see also* R2551–52, ECF No. 72-50). M "returned to baseline on her own," and the Record does not indicate that any further action was taken by Maple Lake. (R2552, ECF No. 72-50). The Clinical Progress Notes taken on or around the date of this incident do not contain any indication that M was believed to be a "risk of harm to self or others." (*See* R2549, ECF No. 72-50).

d.      On September 20, 2016, staff observed M "picking at her wrists during class." (R2398, ECF No. 72-50). She stopped when instructed to do so by staff. (*Id*.). The Record does not indicate that any further action was taken by Maple Lake. (*Id*.).

e.      On November 13, 2016, staff had to physically restrain M after she threatened staff when they threatened to confiscate her coloring books. (R2144–45, ECF No. 72-49). During the altercation, M "punched and kicked" all three staff members involved and bit one three times, breaking the skin. (*Id*.).

f.      On November 17, 2016, staff had to physically restrain M when she refused to move from her desk to a bench. (R2105–07, ECF No. 72-49). During the altercation, M bit a member of the staff hard enough to break skin. (*Id*.). After M had been moved, staff "saw a broken plastic knife that appeared when [M] sat down and appeared to come from [her] sweatshirt pocket." (*Id*.).

g.      Following an individual therapy session held that same day, staff wrote in a Clinical Progress Note dated November 17, 2016 that M "endorses suicidal ideation." (R2155, ECF No. 72-49). However, those notes downplayed the seriousness of the situation by noting that M "is not currently considering plans including harm herself," that her "[p]lans for suicide are vague," and that M "further reports that she has no intention to act on these feelings and is

willing to accept a safety plan."  (*Id*.).  The note further explained that M stated that "the world has burned" and "I don't even want to live" but "denied any plans to harm herself," and after she "was told any threat to do so would be taken very seriously," M "stated she had no real intention of suicide because of her little brother."  (*Id*.).  In response to these statements, and "[d]ue to a chain of recent aggressive and violent behaviors from [M]" (seemingly the two biting incidents from the week), M's clinical team placed her on a "mattress intervention."  (*Id*.).  Under this safety measure, M was required to "sleep on a mattress outside of the main sleeping area with constant staff supervision."  (*Id*.).  She was "placed in scrubs and [required to] remain on a mattress in the common area for 24 hours" and was not "allowed to participate in the community or communicate with peers.  A staff will be arms length with her at all times and she will sleep in the common area."  (*Id*.).

h.      Clinical Progress Notes prepared the next day, November 18, 2016, show that M stated that she "was not having thoughts of hurting herself."  (R2151, ECF No. 72-49).

i.      On December 14, 2016, M reported to staff that she "used to have suicidal thoughts, but she feels better now and is happy."  (R2082, ECF No. 72-49).

j.      Notes dated January 1, 2017, state that in response to a threat of discipline, M said that "she wished she would just die" and later said that she "wouldn't be able to make it through the night, and that she wouldn't be surprised if she found something sharp and ran away from staff and stabbed herself with it."  (R1929, ECF No. 72-48).  The Record does not indicate that any further action was taken by Maple Lake.  (*Id*.).

k.      Notes dated March 5, 2017, state that in response to being warned that if she did not get out of bed, staff would take away her blankets, M responded "I don't care, I just want to die."  (R1733, ECF No. 72-48).  The Record does not indicate that any further action was

taken by Maple Lake, and the same notes state that later that day M "showed signs of feeling better." (*Id*.).

l.  Notes dated March 14, 2017, state that in response to being asked "about when [she] gets upset and says 'I want to die,'" M "told staff that [she] doesn't want to die in those moments and doesn't plan on hurting herself." (R1694, ECF No. 72-47).

m.  Notes dated March 20, 2017, show that M was exhibiting "negative behavior" and saying things like "the good thing about life is its over soon." (R1673, ECF No. 72-47). Staff talked to her about being negative, and nothing more was made of the incident. (*Id*.).

n.  Notes dated March 25, 2017, state that M had "repeatedly talked about hating [Maple Lake], hating the supervisor, wanted to burn the house down, and continued to mention, and dictate suicidal thoughts [s]uch as 'I wish I was dead, it would be better to have someone shoot me or me shoot someone else, why am I here, the students hate me, staff hate me, my family doesn't want me to be at home anymore.'" (R1638, ECF No. 72-47). The Record does not indicate that any further action was taken by Maple Lake, and M hugged staff before going to bed. (*Id*.).

o.  On April 13, 2017, staff had to carry M to a vehicle after she refused to willingly return to Maple Lake from an off-campus event. (R1524–25, ECF No. 72-47; *see also* R1536–37, ECF No. 72-47; R1305–06, ECF No. 72-46).

p.  Notes dated April 28, 2017, indicate that M "appeared to be in a very bad mood" and was talking about "how much she hated Maple Lake, how much better it would be if she didn't exist, and how much she hated her peers here." (R1497, ECF No. 72-47). The notes also state that M "used a lot of self harm and suicide imagery and ideas, such as 'I wish I could

14

boil the earth in blood' and '[e]verything would be easier if I didn't exist.'"  (R1498, ECF No. 72-47).  Staff informed M that she needed to be more positive, and the Record does not indicate that any further action was taken by Maple Lake.  (*Id*.).

q.  On May 1, 2017, M "cursed at staff and said 'I hate maple lake, and anyone who lives here wants to die."  (R1488, ECF No. 72-47).  Staff told M she needed to have a good attitude, and the Record does not indicate that any further action was taken by Maple Lake.  (*Id*.).

r.  Notes dated May 5, 2017, detail an incident where M "started yelling about how she has been treated unfairly, that the world and universe is against her and that the world is evil and that she would be better off dead, by slitting her wrists and letting all the blood drain out."  (R1467, ECF No. 72-47).  Following that outburst, staff observed that M "looked like she was using her thumb nail to rub her wrist," which staff stopped her doing.  (*Id*.).  The Record does not indicate that any further action was taken by Maple Lake.  (*See* R1467–68, ECF No. 72-47).

s.  On May 16, 2017, staff had to restrain M after she attempted to walk past the permitted fence line of Maple Lake.  (*See* R1417–19, ECF No. 72-47).  Following the incident, M was placed on "mattress and run risk red."  (R1419, ECF No. 72-47).  Staff mentioned this incident in the "risk of harm to self or others" section of the Clinical Progress Note from M's individual therapy session the following day.  (R1412, ECF No. 72-47).

t.  In Doctor's Progress Notes dated May 31, 2017, Medical Director Jason Anderson wrote that M "denied suicidal ideation or self-harm thoughts, but endorses sadness."  (R1353, ECF No. 72-46).

u.      On June 2, 2017, M hit a staff member when she tried to take a notebook away from her.  (R1243–44, ECF No. 72-46).

v.      On June 5, 2017, M was involved in an incident in which she "walked upstairs to the loft" and was "appearing to be preparing to jump off the edge as evidenced by [her] putting her leg over the banister."  (R1324, ECF No. 72-46; *see also* R1225–26, ECF No. 72-46).  M did not resist when staff grabbed her arm.  (*Id.*).  As a result of this incident, M was put on red status.  (*Id.*).

w.      On June 6, 2017, M was involved in a minor altercation where she was arguing with, and was shoved by, another student.  (R1307–08, ECF No. 72-46).

x.      On June 28, 2017, staff told M that if she did not stop writing in her binder, it would be taken from her.  (R1216–17, ECF No. 72-46).  She responded that "'I will beat you to death if you take my binder.'"  (*Id.*).  When staff took M's binder, M kicked and punched the staff member.  (*Id.*).  M then "started to try banging her head against [the staff member's] and throw [her] against the door.  [M] hit her head into [the staff member's] lip which got cut and swollen."  (*Id.*).  Additional staff members came to help control M and get her calmed down.  (*Id.*; *see also* R1204–05, ECF No. 72-46).  M was placed on red status as a result of this incident.  (R1214, ECF No. 72-46).

y.      That same day, notes indicate that M's therapist "warned staff that [M] was in a pretty bad place, talking about suicide and culling herself."  (R1211, ECF No. 72-46).  In response to this warning, staff reported that they "attempted to comfort and distract [M] to help her feel better."  (*Id.*).  The Record does not indicate that any further action was taken by Maple Lake.

z.      Notes from June 30, 2017, indicate that M was in a bad mood, seemingly upset because she was still on red status, and "began talking about suicide." (R1203, ECF No. 72-46). Staff spoke to M, and the Record does not indicate that any further action was taken. (*Id.*).

aa.      On July 16, 2017, M became upset with staff and said that she wanted to kill them. (R1142, ECF No. 72-46). She was placed on yellow status. (*Id.*).

bb.      On July 27, 2017, M was put in a hold by staff when she refused to participate in recreational therapy. (R1103, ECF No. 72-46).

cc.      Notes from M's August 1, 2017 individual therapy session indicate that M "was making statements about it being better if she wasn't alive and wanted to be dead." (R1067, ECF No. 72-45). M's counselor noted that "there was no plan involved" and that M "has a history of making these statements when upset." (*Id.*). Nonetheless, "[s]taff was [made] aware of the statements being made and was aware to keep an extra eye on her." (*Id.*).

dd.      On August 21, 2017, M was involved in an incident in which she went outside after arguing with another student. (R988, ECF No. 72-45; *see also* R886–87, ECF No. 72-45). Once outside, she "began running away off campus," "hopped one fence" but "stopped running before she was to the street." (R988, ECF No. 72-45). She then "picked up a large rock and talked about killing herself." (*Id.*). She "eventually put the rock down and came back inside with staff," where she "laid on her bed and talked about committing suicide." (*Id.*). As a result of this incident, M was "placed on 24h mattress, suicide watch and run risk." (*Id.*).

ee.      Notes from M's August 23, 2017 individual therapy session indicate that M "spoke about not wanting to live." (R978, ECF No. 72-45). However, M's counselor

seemingly dismissed this talk, noting that M "makes these statements regularly and did not have a plan." (*Id.*). Nonetheless, the notes indicate that M "will be observed closely." (*Id.*).

        ff.     On August 23, 2017, M was upset with staff and "went to the loft as if she were going to jump over the balcony." (R975, ECF No. 72-45). The Record does not indicate that any further action was taken by Maple Lake.

**<u>Anthem's Denial</u>**

        34.     Anthem Denied coverage for M's Treatment in full (the "Denial") through a series of Explanation of Benefits Letters ("EOB Letters"). The Record contains approximately nineteen (19) of these EOB Letters.[8]

        35.     While the language in these EOB Letters often varied, as a whole, they presented two primary reasons to support the Denial: because Anthem lacked medical records and an itemized list of charges and because the Treatment was not medically necessary. (*See e.g.*, R581–86, ECF No. 72-18 (denying on the basis that Anthem had not received the "medical records and an itemized list of the charges associated with [M's] treatment"); R649–54, ECF No. 72-28 (stating that the claim "could not be covered" and explaining that "[s]ervices are excluded when the medical necessity guidelines determines [sic] the services are not performed in the least costly setting of care (Inpatient vs. Outpatient). Services could have been provided in a more cost effective setting")).

        a.     Beginning with an EOB Letter that was prepared on March 3, 2017, Anthem relied on a lack of medical records and an itemized list of charges to deny coverage for M's Treatment. (*See* R581–86, ECF No. 72-18). Each of the initial EOB Letters that Anthem prepared denied coverage for this reason. (*See* R539–44, ECF No. 72-12; R525–30, ECF No.

---

[8] Many of these EOB Letters are included in the Record multiple times. The court has only cited to one of the included versions of each letter.

72-10; R609–14, ECF No. 72-22; R643–48, ECF No. 72-27; R766, ECF No. 72-45; R663–68, ECF No. 72-30; R675–80, ECF No. 72-32; R764, ECF No. 72-45).

36.     On June 13, 2017, Melissa Flythe, LCSW, conducted a screening of Plaintiffs' claim. (R2707–11, ECF No. 72-51). She identified M's diagnoses, summarized the stated reasons for M's admission to Maple Lake, paraphrasing the representation made by M's parents, highlighted two instances where M was found to have been aggressive during her Treatment, and noted that she was unable to locate M's Psychological Evaluation. (*See id.*). Ms. Flythe then sent Plaintiffs' claim on "to [a] consultant for initial review." (R2711, ECF No. 72-51).

37.     That initial review was conducted by Dr. Laura Worrel on July 4, 2017. (R2714, ECF No. 72-51). Dr. Worrel "reviewed the clinical information provided including the lengthy medical record available for this mental health residential treatment." (*Id.*). Her review summarized and/or highlighted aspects of M's Treatment, including her diagnoses, medications, and treatment plan and concluded that "[m]edical necessity was not met." (*Id.*). Dr. Worrel also noted that the record was missing M's Psychological Evaluation. "[t]here is no psychiatric evaluation or report from psychological testing in the chart." (R2714, ECF No. 72-51).

38.     Following this review, on or about July 5, 2017 Anthem prepared a letter to Plaintiffs (the "Denial Letter") that gave a more thorough reason for its Denial. (R509–16, ECF No. 72-8). In relevant part, that Denial Letter explained that services must be considered "medically necessary" in order to be covered and offered the definition that Anthem applies, from the Plan's clinical criteria, to determine if "short-term residential treatment [is] medically necessary." (R509–10, ECF No. 72-8). The Denial Letter concluded that "[t]he information we have does not show that your behaviors had worsened, that your behavior was putting you at risk for serious harm, that 24 hour structured care was needed, or you could not get needed treatment

while in your current living situation. For these reasons, the request is denied as not medically necessary." (R510, ECF No. 72-8). It further concluded that "in this case, [M's] care does not need a hospital stay." (R509, ECF No. 72-8). Plaintiffs assert that they did not receive this Denial Letter until February 19, 2018. (Amend Compl., ECF No. 39 at 3, n. 1).

39.     EOB Letters prepared on July 10, 2017 (R649–54, ECF No. 72-28), August 4, 2017 (R681–86, ECF No. 72-33), and August 31, 2017 (R693–98, ECF No. 72-35) each stated that Anthem was denying Plaintiffs' subject claims on the basis that M's treatment was not medically necessary.

40.     As Plaintiffs continued to submit claims for each month of M's Treatment, Anthem continued to issue EOB Letters denying the claims.

41.     On or about October 16, 2017, Plaintiffs appealed Anthem's Denial. (*See* R755–59, ECF No. 72-45). This appeal triggered an additional review of his claim, this one completed by Dr. Soni Manish on February 14, 2018. (R2723–25, ECF No. 72-51).

42.     Dr. Manish reviewed notes and "the lengthy chart that was provided." (R2723, ECF No. 72-51). Dr. Manish noted that "limited information is available about why a residential placement was initiated" and that Anthem does not "know if the pre-admission level of aggression was to the degree that would have required [Residential Treatment]." (*Id.*). She summarized M's prior treatments and medication history. (*Id.*). Dr. Manish also analyzed M's Treatment, finding that both the "treatment plan" and "medical necessity for admission itself" were unclear, noting that it was "unclear how often [a] psychiatrist was evaluating [M]," that only "minimal" changes were made to M's medication during her stay, and that the issues for which M was admitted to Maple Lake—a history of oppositional behavior, passive suicidal ideations, superficial cutting, and difficulties at school—could have been treated "at lower levels

of care." (R2725, ECF No. 72-51). Dr. Manish concluded that based on this information, "I do not believe that [medical necessity criteria] for [Residential Treatment] was met" and that coverage for M's Treatment should therefore be denied. (*Id.*).

43. Following this review, and by letter dated February 19, 2018, Anthem, upheld the Denial. (R502–08, ECF No. 72-7). In the letter, Anthem stated that it reviewed the "new information" that Plaintiffs had sent it, including "medical record plus letters," but agreed with its "first decision," as M was "not at risk for serious harm that [she] needed 24 hour care" but instead "could have been treated with other services." (R503, ECF No. 72-7). The letter reiterated Anthem's conclusion that the "services are considered not medically necessary." (R503, ECF No. 72-7).

44. Finally, the letter stated that "due to the outcome of the appeal all claims in question in the appeal letter will be adjusted to reflect the decision of Not Medically Necessary and new EOBs will be produced for your reference." (R503, ECF No. 72-7). That "new EOB" was prepared on February 26, 2018, and stated that Anthem was denying claims for M's treatment at Maple Lake for the periods of 7/1/2016 – 7/31/2016; 8/1/2016 – 9/1/2016; 9/1/2016 - 10/30/2016; 10/1/2016 – 10/31/2016; 11/1/2016 – 11/30/2016; 12/1/2016 - 12/31/2016; 1/1/2017 - 1/31/2017; 2/1/2017 – 3/1/2017; 3/1/2017 - 3/31/2017; 4/1/2017 – 4/30/2017; and 11/1/2017 – 11/14/2017 on the basis that each treatment period "could not be covered." (R517–24, ECF No. 72-9). The letter further explained that "[s]ervices are excluded when the medical necessity guidelines determines [sic] the services are not performed in the least costly setting of care (Inpatient vs. Outpatient). Services could have been provided in a more cost effective setting." (R521, ECF No. 72-9).

45. Plaintiffs initiated this action on January 17, 2019. (*See* Compl., ECF No. 3).

**DISCUSSION**

Plaintiffs assert two claims against Defendants.  The first is for a denial of benefits under 29 U.S.C. § 1132(a)(1)(B) (the "ERISA Claim") and alleges that Defendants violated the terms of the Plan, and breached their fiduciary duty to Plaintiffs, by denying Plaintiffs' claim on the basis that M's Treatment was not medically necessary.  The second arises under 29 U.S.C. § 1132(a)(3) and alleges that Defendants violated the Mental Health Parity and Addiction Equity Act (the "Parity Act").  Each will be discussed in turn.

### I.  STATEMENT REGARDING INCOMPLETE RECORD.

As noted above, the Record appears to be incomplete, as it lacks records for the first fifteen (15) and last forty-five (45) days that M spent at Maple Lake.  (*See* R2706, ECF No. 72-50; R818, ECF No. 72-45).  It is unclear whether these records were reviewed by Anthem but omitted from the Record, were never seen by Anthem, or simply never existed.[9]  What is clear, based upon the totality of the Record before the court, is that the contents of these missing records are not material.

The Record contains records from approximately 64 of the 72 weeks that M spent at Maple Lake.  While it lacks records from the first two weeks, the records from the following sixty-four weeks thoroughly document M's condition, treatment, and progression while she was at Maple Lake.  While the court acknowledges that relevant information may have been contained in records that were created within those first two weeks (if such records did in fact exist), such information could not outweigh, or change the court's interpretation of, the picture painted by the records from these following sixty-four weeks.  As will be discussed below, that picture clearly shows that M

---

[9]  The court believes that these records exist but were not submitted to or reviewed by Anthem.  The Record makes numerous references to a Psychiatric Evaluation that was allegedly completed in July 2016 yet is not a part of the Record.  The court assumes that the evaluation was completed before July 13, 2016 and is therefore a part of these seemingly omitted records.  (*See* R2661, ECF No. 72-50 (indicating that M's "initial psych evaluation" had been completed before July 20, 2016)).

did not pose a risk of serious harm.  Similarly, the fact that M was released shortly after any records from the final five weeks of her Treatment were created strongly indicates that the content of any such records would not establish that M's condition had significantly worsened.  If it had, M would not have been released.  Thus, while the court is displeased that the Record is incomplete, it is confident that the Record before it, which covers the vast majority of the time that M spent at Maple Lake, is representative of her entire stay and of the status of her condition during that stay.

It is well established that summary judgment may not be granted if a genuine issue of material fact exists in the dispute.  *See* FED. R. CIV. P. 56(A).  A material fact is one that may affect the outcome of the litigation.  *See Anderson*, 477 U.S. at 248.  Because, for the reasons stated above, the court finds that the contents of any documents that are missing from the Record would not affect the outcome of this litigation, their absence is not material and does not preclude the court from granting the relief ordered herein.

Moreover, the court notes that it was Plaintiffs' burden to demonstrate that had any of these missing records been considered, they would have changed the outcome of Anthem's determination.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing FED. R. CIV. P. 56(e)).  They have failed to do so.  Instead, Plaintiffs merely assert that they are "unsure" why a missing Psychiatric Evaluation was not included in the Record.  (*See* ECF No. 81 at 6).  While the court is unsure how Plaintiffs and Defendants have both failed to recognize these significant omissions, for the reasons stated above, it does not find that the omissions prohibit it from granting the relief ordered herein.

## II.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' ERISA CLAIM.

Plaintiffs' ERISA Claim seeks to recover benefits for M's Treatment, in the amount of approximately $176,000.00, and alleges that Defendants violated the terms of the Plan, and breached their fiduciary duty to Plaintiffs, when they declared, and rejected Plaintiffs' claim on

the basis that, M's Treatment was not medically necessary.[10]  In essence, Plaintiffs' ERISA Claim

focuses on whether the Record shows that M's Treatment was, in fact, medically necessary.  Before

the court can answer that question, it must first determine the standard of review it must apply to

analyze Anthem's decision that it was not.

## A.  Standard of Review.

In ERISA cases, "a denial of benefits challenged under § 1132(a)(1)(B) must be reviewed

under a *de novo* standard unless the benefit plan expressly gives the plan administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the plan's terms."

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 102 (1989).  "Where the plan gives the

administrator discretionary authority, however, 'we employ a deferential standard of review,

asking only whether the denial of benefits was arbitrary and capricious.'" *Eugene S. v. Horizon*

*Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1130 (10th Cir. 2011) (quoting *LaAsmar*,

605 F.3d at 796).  The administrator "bears the burden of proving a decision should be reviewed

under an arbitrary-and-capricious standard." *LaAsmar*, 605 F.3d at 796.

Even if a plan gives an administrator discretionary authority, the administrator can lose the

benefit of arbitrary and capricious review if it does not "valid[ly] exercise . . . that discretion." *See*

*Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009) (quotations and citations omitted).

For example, the Tenth Circuit has "applied de novo review where deferential review would

otherwise be required in the face of serious procedural irregularities." *Martinez v. Plumbers &*

*Pipefitters Nat. Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015) (citations omitted).  Here,

---

[10]  Plaintiffs allege that Anthem also denied coverage for M's Treatment on the basis that her stay was too long.  That allegation is not supported by the record.  While Dr. Worrel noted in her review of M's medical records that her stay at Maple Length was "lengthy" (R2714, ECF No. 72-51), her conclusion, as well as the conclusion of Dr. Manish after her, was that M's medical records did not establish that her Treatment was medically necessary.  (*See* R2725, ECF No. 72-51).  It is clear that Anthem denied coverage for that reason, not because her stay at Maple Lake was lengthy.  (*See* R503, ECF No. 72-7).

Plaintiffs argue that the court should review Anthem's determination that M's Treatment was not medically necessary de novo, as the Plan failed to properly grant Anthem discretionary authority, because Anthem engaged in serious procedural irregularities, and because Anthem failed to timely respond to their appeal.

### 1. *Grant of Discretionary Authority to Anthem*

As noted above, a denial of benefits "must be reviewed under a *de novo* standard unless the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms." *Firestone Tire & Rubber Co.*, 489 U.S. at 102. The Tenth Circuit has similarly recognized that "[t]o enjoy deferential judicial review of its benefits decision, the administrator of an ERISA plan must reserve its discretion 'in explicit terms' in the plan document." *Hodges v. Life Ins. Co. of N. Am.*, 920 F.3d 669, 676 (10th Cir. 2019) (citing *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1250 (10th Cir. 2007)).

Here, the Plan states that Anthem has "sole discretion" to determine whether "benefits for services and supplies . . . are deemed . . . medically necessary." (R48, ECF No. 72-1). The court finds that this language is express, explicit, and makes clear that Anthem would be the party under the Plan to determine whether M's Treatment was medically necessary. Anthem was therefore properly granted discretionary authority, and Defendants have not, therefore, lost the benefit of arbitrary and capricious review.[11]

---

[11] Plaintiffs argue that they were never provided the Administrative Services Agreement (ECF No. 89-2) and that this document was necessary to fully understand the scope of discretion granted to Anthem. This argument is not well taken. The Plan's representation that Anthem has "sole discretion" to determine medical necessity is unambiguous and does not need clarification. (*See* R48, ECF No. 72-1). Indeed, the Administrative Services Agreement merely reiterates that "Anthem is delegated full discretion to determine eligibility for benefits under the Plan and to interpret the terms of the Plan." (R2919, ECF No. 89-2). Plaintiffs did not need to have received the Administrative Services Agreement to learn that Anthem would be determining whether M's Treatment was medically necessary; the Plan explicitly provided that information.

## 2. *Alleged Procedural Irregularities*

Plaintiffs also argue that de novo review is proper because the process by which Anthem found that M's Treatment was not medically necessary, and thus denied their claim, was seriously irregular. Plaintiffs' argument focuses on the timeline and contents of the EOB Letters and asserts that those letters provided inconsistent and/or incomplete reasons as to why Anthem was denying coverage.

As discussed above, Anthem issued approximately nineteen (19) EOB Letters in this matter. While the court agrees with Plaintiffs that the timeline of these letters, and the reasons for denial contained therein, is jumbled, it is nonetheless clear that Plaintiffs were on notice that Anthem had determined that M's Treatment was not medically necessary by, at the latest, August of 2017. (*See* R649–54, ECF No. 72-28; R681–86, ECF No. 72-33; R693–98, ECF No. 72-35). Thus, Plaintiffs were fully aware of Anthem's reason for denying M's Treatment before they filed their appeal. Indeed, Plaintiffs attacked Anthem's determination that M's Treatment was not medically necessary in their Appeal.[12]

Because Plaintiffs had received express notice of the reason Anthem was denying coverage for M's Treatment before they filed their appeal, the court cannot find that they were prejudiced by any irregularities in the timeline or content of Anthem's EOB Letters. As such, the court finds that any alleged procedural irregularities present in this case are not "serious" and do not therefore require it to review Anthem's denial de novo.

---

[12] While Plaintiffs attacked the determination as contradictory to Anthem's assertion that it lacked medical records, and not on its merits, it is clear that they had the opportunity to do so. As such, they cannot now assert that they were unaware of Anthem's determination, or somehow prejudiced by not knowing about it sooner. Similarly, while Plaintiffs assert that they did not receive the Denial Letter until after they filed their appeal, the material contents of that letter had already been shared with them through EOB Letters issued before their appeal was filed.

3. *Delay in Deciding Appeal*

Finally, Plaintiffs argue that Anthem's denial should be reviewed de novo because Anthem failed to timely decide their appeal. Plaintiffs appealed Anthem's denial of coverage on or about October 16, 2017. (*See* R755–59, ECF No. 72-45). Anthem appears to have received that appeal on October 19, 2017. (*See* R2721, ECF No. 72-51). It issued a decision on the appeal on February 19, 2018, 123 days after it received notice of the same. (*See* R502–08, ECF No. 72-7).

Under the Plan, Anthem had 60 days from the date it received Plaintiffs' appeal to "respond in writing." (R78, ECF No. 72-1). This timeline is consistent with the applicable regulations, which required Anthem to "notify [Plaintiffs] . . . of [its] benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of [their] request for review." 29 C.F.R. § 2560.503-1(i)(1)(i); *see also* 29 C.F.R. 2590.715-2719(b)(2)(i) (applying, among other things, the timelines provided in 29 C.F.R. § 2560.503-1 to internal claims and appeals processes). Those regulations provide that Anthem was entitled to a 60 day "extension of time for processing" if it first furnished "written notice of the extension . . . to the claimant prior to the termination of the initial 60–day period." (*Id.*). At oral argument, counsel for Anthem represented that Anthem "could give itself" an extension, and implied that it did so, but does not point to a place in the Record where Plaintiffs were notified of such an extension, and the court has not found evidence of such a writing in the Record. As such, for purposes of the motions before it, the court cannot conclude that Anthem's 60-day deadline was extended. Thus, the court finds that Anthem took 123 days to issue a decision on Plaintiffs' appeal, or approximately twice the time allotted to it by the Plan and applicable regulations.

The Tenth Circuit has recognized that when an administrator fails to respond to an appeal, but automatically deems it denied, that decision "come[s] by operation of law rather than through an exercise of discretion" and is thus subject to de novo review. *See Gilbertson v. Allied Signal,*

*Inc.*, 328 F.3d 625, 631 (10th Cir. 2003). It has extended this sentiment beyond just "deemed denials," and has declined "to apply a deferential standard of review" when an administrator decided an appeal "170 days after [the insured] had sought review, or more than three times as long as permitted under the terms of the Plan and the ERISA regulations." *See LaAsmar*, 605 F.3d at 797. Nonetheless, the Tenth Circuit has declined to apply a "'a hair-trigger rule' requiring de novo review whenever the plan administrator . . . failed in any respect to comply with the procedures mandated by this regulation." *See id*. at 799 (citations omitted). Rather, it seems that such review is only proper when an administrator fails to "comply *substantially* with [a] deadline for deciding a claimant's administrative appeal." *See id*. at 800 (emphasis added).

While Anthem was 63 days late in deciding Plaintiffs' appeal, the court does not find that such a delay was substantial. No action was taken following Anthem's denial of Plaintiffs' appeal for nearly a year, until Plaintiffs filed this action on January 17, 2019. As such, Anthem's 63-day delay did not materially impact the progression of this matter. Further, the delay was significantly less than that present in *LaAsmar*, which the Tenth Circuit deemed significant enough to warrant de novo review. *See LaAsmar*, 605 F.3d at 797. While Anthem clearly erred in failing to timely decide Anthem's appeal, given the timeline that this dispute has stretched, this delay was insubstantial and did not prejudice Plaintiffs.

For the reasons stated herein, the court concludes that Anthem has established that it is entitled to have its denial of M's Treatment reviewed under an arbitrary and capricious standard. *See Firestone Tire & Rubber Co.*, 489 U.S. at 102; *Eugene S.* 663 F.3d at 1130; *LaAsmar*, 605 F.3d at 796. However, the court notes that even if it were to apply de novo review, the Record is sufficient to allow it to conclude that M's Treatment was not medically necessary. In short, and as is discussed below, the Record simply does not establish that M was "manifesting symptoms

and behaviors which represent a deterioration from their usual status and include either self injurious or risk taking behaviors that risk serious harm . . . ." (R2797–98, ECF No. 72-56).

### B. There was a reasonable, if not correct, basis for Anthem's determination that M's Treatment at Maple Lake was not medically necessary.

Under the arbitrary and capricious standard of review, a plan administrator's decision will be upheld "unless it is 'not grounded on *any* reasonable basis.'" *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (citation omitted). In fact, "[a]n administrators decision does not need to be the only logical decision, or even the best decision." *Gundersen v. Metro. Life Ins. Co.*, No. 10-cv-00050, 2011 WL 6020575, at *2 (D. Utah Dec. 1, 2011) (citation omitted). The reviewing court "need only assure that the administrator's decision falls somewhere on a continuum of reasonableness–even if on the low end." *Kimber*, 196 F.3d at 1098 (citations omitted). As a result, a district court's review under this standard is limited to whether the determination of medical necessity "was reasonable and made in good faith." *Joseph F. v. Sinclair Services Co.*, 158 F. Supp. 3d 1239, 1248 (D. Utah 2016) (citation omitted).

Under the Plan, for M's Treatment to be considered "medically necessary," M must have been "manifesting symptoms and behaviors which represent a deterioration from [her] usual status and include either self injurious or risk taking behaviors that risk serious harm and cannot be managed outside of a 24 hour structured setting or other appropriate outpatient setting", her "social environment is characterized by temporary stressors or limitations that would undermine treatment that could potentially be improved with treatment while [she] is in the residential facility" and there must have been "a reasonable expectation that the illness, condition or level of functioning will be stabilized and improved and that a short term, subacute residential treatment service will have a likely benefit on the behaviors/symptoms that required this level of care, and that [she] will be able to return to outpatient treatment." (R2797–98, ECF No. 72-56). It was Plaintiffs' burden

to prove that M, and her Treatment, met these standards.  *See LaAsmar*, 605 F.3d at 800.

After thoroughly reviewing the Record, the court concludes that Anthem's determination that M and her Treatment did not meet these standards, and that her Treatment was therefore not medically necessary, was reasonable and made in good faith.  In fact, and as indicated above, the Record is sufficient to independently support Anthem's determination on de novo review.  The Record simply does not establish that M was, either prior to or during her Treatment "manifesting symptoms and behaviors which represent a deterioration from their usual status and include either self injurious or risk taking behaviors that risk serious harm . . . ."  (R2797–98, ECF No. 72-56).

M was admitted to Maple Lake to address two identified problems - "Social (Pragmatic) Communication Disorder" and "Parent-child relational problem."  (*See* R2471–76, ECF No. 72-50).  Neither of these diagnoses inherently involves "either self-injurious or risk taking behaviors that risk serious harm," and the goals that Maple Lake set for M to achieve in relation to these problems show that such a risk of harm was not a concern.  (*See* R2472, ECF No. 72-50; R2475, ECF No. 72-50).  M was subsequently diagnosed with "Autism Spectrum Disorder", "R/O Mood Disorder," "Oppositional Defiance Disorder," (R2187, ECF No. 72-49) and "Major depressive disorder, Single episode, Unspecified" (R1655, ECF No. 72-47).  Again, none of these diagnoses presents an inherent risk of harm, and nothing in the Record indicates that Maple Lake believed that M was being treated to prevent such a risk.  Indeed, the "Justification for Continued Treatment" in M's Treatment Plan Review expressed concern over her "ability to self-regulate, empathize with the concerns of authority and society in general, and to create a stable and healthy identity that will provide some independence for her self and interdependence with her family members . . . ."  (R1656, ECF No. 72-47).  It was silent as to any need for M to remain in treatment to protect her own safety or the safety of anyone around her.  As such, it appears, from the face of

M's Treatment, that she was not at Maple Lake to address or treat "self-injurious or risk taking behaviors that risk serious harm." It is worth noting that M's treatment plans are consistent with the reasons why her parents admitted her into Maple Lake, namely that she was not attending school and was difficult at home. (*See* R2586, ECF No. 72-50).

Although M's Treatment was clearly not designed to treat a presented risk of serious harm, the Record nonetheless contains incidents that indicate that M did indeed engage in some self-injurious and/or harmful behaviors. These incidents can be categorized into two categories: threats of suicide/self-harm and acts of violence towards others. But the Record shows that none of these incidents was serious.

Prior to her admission to Maple Lake, M's parents reported that she had done "some self harming" in the form of "superficial cuts on her arms and upper legs" but were unsure whether she was still engaging in such "cutting." (R2587, ECF No. 72-50). While at Maple Lake, M frequently made comments, or even threats, about wanting to commit suicide, but they were almost always dismissed by her counselors. (*See* R2155, ECF No. 72-49 (noting that M "endorses suicidal ideation" but dismissing the same by recognizing that she "is not currently considering plans including harm herself," that her "[p]lans for suicide are vague," and that she "reports that she has no intention to act on these feelings and is willing to accept a safety plan."); *see also* R1498, ECF No. 72-47 (staff responded to M's "use of a lot of self harm and suicide imagery and ideas" by telling her that she needed to be more positive); R1067, ECF No. 72-45 (recognizing that M "has a history of making [statements about it being better if she wasn't alive and wanted to be dead] when upset" but that "there was no plan involved"); R978, ECF No. 72-45 (same)). Indeed, M herself frequently reassured staff at Maple Lake that she had no plans to harm herself. (*See* R2151, ECF No. 72-49 (stating that she "was not having thoughts of hurting herself"); R2082, ECF No.

72-49 (stating that she "used to have suicidal thoughts, but she feels better now and is happy");
R1694, ECF No. 72-47 (she told staff that although she "gets upset and says 'I want to die,' [she]
doesn't want to die in those moments and doesn't plan on hurting herself"); R1353, ECF No. 72-
46 (recognizing that M "denied suicidal ideation or self-harm thoughts, but endorses sadness")).

There are only a few instances in the Record where M's threats of self-harm were arguably
acted upon. Once she was observed "picking at her wrists during class," but she stopped when
instructed to do so, and nothing else was made of the matter. (*See* R2398, ECF No. 72-50). Twice,
M threatened to jump off a balcony in the loft, but neither instance was serious. In the first, she
was observed "appearing to be preparing to jump off the edge [of a loft]" but did not resist when
staff grabbed her arm, (R1324, ECF No. 72-46; *see also* R1225–26, ECF No. 72-46), and in the
second did not result in any further action from Maple Lake. (R975, ECF No. 72-45). Finally,
after arguing with another student, M began running away off campus," "hopped one fence," but
"stopped running before she was to the street" where she "picked up a large rock and talked about
killing herself," which she "eventually put . . . down and came back inside with staff." (R988,
ECF No. 72-45; *see also* R886–87, ECF No. 72-45). As a result of that incident, M was "placed
on 24h mattress, suicide watch and run risk." (*Id.*). While the court views these incidents with
sympathy, it does not find that Anthem acted unreasonably or in bad faith when it determined that
they did not rise to the level of a serious risk of harm. Indeed, the court finds that they did not.

Similarly, while the Record contains incidents where M became violent with her
counselors, none of these incidents risked "serious harm." Rather, in each, the violence was
directed at Maple Lake Staff and resulted from M's difficulty in following the rules imposed on
her at the facility. (*See* R2144–45, ECF No. 72-49 (M punched, kicked, and bit staff members
after the threatened to confiscate her coloring books); R2105–07, ECF No. 72-49 (M bit a staff

member hard enough to break skin after she was restrained for refusing to leave her desk); R1243–44, ECF No. 72-46 (M hit a staff member when she tried to take a notebook away from her); R1216–17, ECF No. 72-46 (M punched, kicked, and head-butted a staff member who tried to take away her binder)). Such actions seem to be a departure of M's normal behavior, as her mother reported that she had not been violent prior to her admission. (R2189, ECF No. 72-49). Indeed, the only indication in the Record that M was violent prior to her time at Maple Lake involved *threats*, not *acts*, of violence. (*See* R2586, ECF No. 72-50). While the court acknowledges that each of these incidents is troubling, it cannot overlook the fact that they were isolated and occurred scattered through a 16-month period. When viewed in this light, the totality of these incidents do not show that M posed a serious risk of harm. As such, Anthem's determination that M's Treatment was not medically necessary was not unreasonable or made in bad faith. Rather, it is supported by the Record and appears to be correct.

In sum, the Record contains sufficient evidence to support Anthem's determination that M's Treatment was not medically necessary, both under an arbitrary and capricious or a de novo standard of review. After thoroughly reviewing the Record, the court determines that it shows that M was not "manifesting symptoms and behaviors which represent a deterioration from their usual status and include either self injurious or risk taking behaviors that risk serious harm . . . ." (R2797–98, ECF No. 72-56). As such, Plaintiff cannot establish that Anthem's determination that M's Treatment was not medically necessary, and its subsequent decision to deny coverage for Plaintiffs' Treatment, violated the terms of the Plan or constituted a breach of Anthem's fiduciary duty to Plaintiffs. Defendants are therefore **ENTITLED TO SUMMARY JUDGMENT** on Plaintiffs' ERISA Claim.

### III. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' PARITY ACT CLAIM.

"[T]he Parity Act is designed 'to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans.'" *Candace B. v. Blue Cross*, No. 2:19-cv-39, 2020 WL 1474919, at *4 (D. Utah Mar. 25, 2020) (quoting *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016)). As such, "a health plan that provides medical and surgical benefits as well as mental health or substance abuse benefits cannot 'impose more restrictions on the latter than it imposes on the former.'" *Id*. (quoting *Michael W. v. United Behavioral Health*, 420 F. Supp. 3d 1207, 1233 (D. Utah Sept. 27, 2019)).

One key category of such restrictions, and that which is relevant here, is "treatment limitations." *See* 29 C.F.R. § 2590.712(a). There are two forms of treatment limitations: "quantitative . . which are expressed numerically" and "nonquantitative . . . which otherwise limit the scope or duration of benefits for treatment under a plan or coverage." *Id*. In essence, "an insurer violates the Parity Act if it employs 'a nonquantitative limitation for mental health treatment that is more restrictive than the nonquantitative limitation applied to medical health treatments.'" *Candace B*., 2020 WL 1474919, at *4 (quoting *David S. v. United Healthcare Ins. Co.*, No. 2:18-cv-803, 2019 WL 4393341, at *3 (D. Utah Sept. 13, 2019)); *see also* 29 C.F.R. § 2590.712(c)(4)(i) (noting that under the Parity Act, "[a] group health plan . . . may not impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan . . . as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes,

strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification.").

In addition to being either quantitative or nonquantitative, treatments limitations can be either "*facial* (as written in the language or the processes of the plan) or *as-applied* (in operation via application of the plan)." *Peter E. v. United HealthCare Servs., Inc.*, No. 2:17-cv-435, 2019 WL 3253787, at *3 (D. Utah July 19, 2019) (emphasis in original); *see also Michael W.*, 420 F. Supp. 3d at 1235. As-applied limitations involve an unequal or discriminatory application of a plan's facially neutral limitations. *See Anne M. v. United Behavioral Health*, No. 2:18-CV-808, 2019 WL 1989644, at *2 (D. Utah May 6, 2019) ("Under an as-applied challenge, a plaintiff may 'allege an impermissible mental-health exclusion "in application"—as opposed to a facial attack relying solely on the terms of the plan at issue.'" (quoting *A.Z. by & through E.Z. v. Regence Blueshield*, 333 F. Supp. 3d 1069, 1081–82 (W.D. Wash. 2018))); *see also Michael D. v. Anthem Health Plans of Kentucky, Inc.*, 369 F. Supp. 3d 1159, 1176 (D. Utah 2019).

Because the Tenth Circuit has not yet "promulgated a test to determine what is required to state a claim for a Parity Act violation . . . this court has adopted a three-part analysis." *Nancy S. v. Anthem Blue Cross & Blue Shield*, No. 2:19-cv-231, 2020 WL 2736023, at *3 (D. Utah May 26, 2020) (citations omitted). Under this test, a plaintiff asserting a violation of the Party Act must "(1) identify a specific treatment limitation on mental health benefits, (2) identify medical/surgical care covered by the plan that is analogous to the mental health/substance abuse care for which the plaintiffs seek benefits, and (3) plausibly allege a disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog." *Id.* (internal quotations and citations omitted).

Regarding the first factor, Plaintiffs have identified two alleged treatment limitations that they claim violate the Parity Act—how the Plan and guidelines define and/or treat Residential Treatment Centers and Skilled Nursing Facilities and how generally accepted standards of medical practice are applied in determining whether treatment is necessary for each.[13]  Because the parties acknowledge that skilled nursing facilities are the medical/surgical analog to residential treatment centers like Maple Lake that offer mental health treatment, the second factor is satisfied.  (*See* ECF No. 55 at 5).  It is now the court's job to determine whether Plaintiffs have satisfied the third factor by showing "a disparity between [these alleged] treatment limitation[s] on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog."  *Nancy S.*, 2020 WL 2736023, at *3.

## A. Alleged disparity in the Plans' definitions and guidelines

Plaintiffs' first alleged treatment limitation focuses on how the Plan and guidelines define and/or treat Skilled Nursing Facility and Residential Treatment Centers.  Plaintiffs allege that Defendants have violated the Parity Act by defining these forms of treatment in "starkly disparate terms."  (ECF No. 74 at 24).  While the 2016 Plan does not expressly define a Residential Treatment Center, it defines Residential Treatment as "specialized 24-hour treatment in a licensed Residential Treatment Center or intermediate care Facility" that "offers individualized and intensive treatment and includes . . . [o]bservation and assessment by a psychiatrist weekly or more often, [r]ehabilitation, therapy, and education."  (R33, ECF No. 72-1).  The 2016 Plan defines a Skilled Nursing Facility as "a facility licensed by the state in which it operates to provide medically

---

[13]  Whether these claims are classified as facial or as-applied "matters little to the ultimate decision."  *See L.P. by & through J.P. v. BCBSM, Inc.*, No. 18-cv-1241, 2020 WL 981186, at *6 (D. Minn. Jan. 17, 2020), *report and recommendation adopted*, No. 18-cv-1241, 2020 WL 980171 (D. Minn. Feb. 28, 2020).

skilled services to inpatients." (R89, ECF No. 72-1).

The 2017 Plan repeats the 2016 Plan's definition of Residential Treatment (R136, ECF No. 72-2) and adds a definition for a "Residential treatment center/facility": "a provider licensed and operated as required by law, which includes: room, board and skilled nursing care (either an RN or LVN/LPN) available on-site at least eight hours daily with 24 hour availability; a staff with one or more doctors available at all times; residential treatment takes place in a structured facility-based setting; the resources and programming to adequately diagnose, care and treat a psychiatric and/or substance use disorder; facilities are designated residential, subacute, or intermediate care and may occur in care systems that provide multiple levels of care; is fully accredited by the Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA)." (R202, ECF No. 72-2). The 2017 Plan repeats the 2016 Plan's definition of a Skilled Nursing Facility. (*Id.*)

Plaintiffs argue that on their face, the differences in these definitions constitute "significant nonquantitative treatment limitation[s] that violate[] the Parity Act" and that "Anthem cannot [therefore] argue it treats the two analogous levels of care the same." (ECF No. 74 at 26). But the Parity Act does not require equality between nonquantitative limitations on treatment at Residential Treatment Centers and Skilled Nursing Facilities. Rather, "any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation" to treatment at a Residential Treatment Center must be "*comparable to*, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to" treatment at a Skilled Nursing Facility. *See* 45 CFR 146.136(c)(4)(i) (emphasis added). As such, the fact that the Plans define Residential Treatment Centers and

Skilled Nursing Facilities differently is not enough, by itself, to prove a violation of the Parity Act. Rather, "the Court must also look beyond the definitions to determine whether the Plan imposes more a restrictive nonquantitative limitation on treatment in a residential treatment center than treatment in a skilled nursing facility." ¶ 371,415 *Michael M., Barbara R., and Lillian M., Plaintiffs, v. Nexsen Pruet Group Medical and Dental Plan, Defendant., Pens. Plan Guide (CCH)* P 371415. It cannot find that it does. Plaintiffs argue that differences in the definitions, and applicable guidelines, as to required evaluations, physician visits, accreditation, and risk of harm for each create impermissible disparities, but when the court reads the Plan as a whole, it does not find that such differences "meaningfully distinguish[]" "the treatment covered at a residential treatment center and a skilled nursing facility." *Id.*

Plaintiffs point out that Anthem's guidelines for residential treatment centers state that an evaluation by a qualified physician *should* be completed "within 48 hours," but that no such requirement exists for skilled nursing facilities. (R2839, ECF No. 72-61). But this guideline is merely suggestive (as indicated by the qualifier "should"), not disqualifying. It does not therefore create a meaningful, or disparate, treatment limitation.

Plaintiffs also assert that Anthem's guidelines suggest that "[i]n a residential treatment center, there should be individual treatment with a qualified physician at least once a week . . ." (*see* R2738, ECF No. 72-52), but that in order to qualify for treatment at a Skilled Nursing Facility, an individual's treatment must necessitate "frequent on-site visits" from a physician. (*See* R2813, ECF No. 72-57). The does not find that the difference between "frequent" and "weekly" is material or significantly disparate.

Plaintiffs next highlight that the Plan requires a Residential Treatment Center to be "fully accredited by the Joint Commission (TJC), the Commission on Accreditation of Rehabilitation

Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA)" (R202, ECF No. 72-2), but that a Skilled Nursing Facility need only be "licensed by the state in which it operates to provide medically skilled services to inpatients." (*Id*.). Again, the court does not find that this is a meaningful difference that constitutes a disparate limitation on treatment, especially when Maple Lake's accreditation, or lack thereof, was immaterial to Anthem's decision to deny coverage. Moreover, the court finds that the Plan's definition is ambiguous as to whether such accreditation is actually *required*. While the definition clearly requires a Residential Treatment Center to be "licensed . . . as required by law" (as it does for Skilled Nursing Facilities), it states that a Residential Treatment Center "includes . . . those that are "fully accredited" by the listed organization; it does not clearly require such accreditation. (*See id*.).[14]

Finally, Plaintiffs point out that the Plan and guidelines require "self injurious or risk taking behaviors that risk serious harm" for treatment at a Residential Treatment Center (R2797–98, ECF No. 72-56) but only require that a condition need "skilled care" to qualify to be treated at a Skilled Nursing Facility. (*See* R2843, ECF No 72-61). While these standards are clearly different, they are neither disparate nor incomparable, as they both stem from the guidelines' rationale that the need for treatment is governed by the severity of a patient's illness. (*Compare* R2839–40, ECF No. 72-61 (recognizing that services at a Skilled Nursing Facility must be "reasonable and necessary for the treatment of an individual's illness or injury (that is, be consistent with the nature and severity of the individual's illness or injury, his particular medical needs and accepted standards of medical practice)") *with* R2797–98, ECF No. 72-56 (hinging medical necessity on

---

[14] Even if this ambiguity is construed in Plaintiffs' favor, and the court read the definition as requiring these accreditations, it would be immaterial, as it is clear that M's Treatment was not denied because Maple Lake was not accredited and because this requirement is not a significant limitation that makes coverage for mental health more restrictive than coverage for medical/surgical treatments.

the "severity of illness")). The fact that the guidelines for mental health and medical/surgical treatment impose different thresholds for determining when an illness is severe enough to necessitate treatment is not an impermissible disparity; it is a logical consequence of the undeniable reality that every illness is inherently different and requires different treatment. This is why the Parity Act only requires comparability, not equality, between limitations for Residential Treatment Centers and Skilled Nursing Facilities. While Plaintiffs argue that Anthem should have only asked "whether M.'s conditions required skilled care to be effectively treated," (ECF No. 81 at 35), as discussed below, Anthem's guidelines are based on generally accepted standards of medical practice. Plaintiffs' opinion as to what those guidelines should be is not controlling and does not trump those standards. The court does not find that the Plan's threshold for treatment at a Residential Treatment Center is more restrictive than that for a Skilled Nursing Facility.

While neither the Plan's definitions of Residential Treatment Centers and Skilled Nursing Facilities nor Anthem's guidelines are identical, they do not need to be. After reviewing those differences, and the Plan as a whole, the court finds that the definitions and guidelines are comparable and do not therefore violate the Parity Act.

**B. Alleged disparity in the how generally accepted standards of medical care are applied in determining medical necessity**

Plaintiffs' final argument is that Anthem has violated the Parity Act because the guidelines it applies to determine medical necessity for treatment at Skilled Nursing Facilities comply with generally accepted standards of medical practice, but the standards it applies to determine medical necessity for treatment at Residential Treatment Centers do not. But Plaintiffs have failed to establish both that Anthem's guidelines as to Residential Treatment Centers do not comply with generally accepted standards of medical practice or that its guidelines as to Skilled Nursing

Facilities do.[15]  Plaintiffs assert that by limiting treatment at a Residential Treatment Center to only short-term duration and requiring a risk of serious harm, Anthem's guidelines violate generally accepted standards of medical practice.  To support both assertions, Plaintiffs rely heavily on a non-binding decision from the Northern District of California, *Wit v. United Behav. Health*, No. 14-cv-2346, 2020 WL 6479273 (N.D. Cal. Nov. 3, 2020), a decision that is not binding on this court.  Absent this case, Plaintiffs are unable to establish that Anthem's guidelines do not comply with generally accepted standards of medical practice.

Indeed, and as noted above, Anthem's guidelines are developed by a "multiple disciplinary group including physicians from various medical and behavioral health specialties, clinical practice environments and geographic areas" and are designed to be "objective and based on medical evidence for certain new medical services and/or procedures or for new uses of existing services and/or procedures." (R2912–13, ECF No. 89-1).  They are based on, among other things, "[n]ational physician specialty societies and associations" and are reviewed "on an annual basis to look for new peer reviewed medical studies or other authoritative sources that have been published that could impact the policy's determination as to the medical necessity or investigational nature of the service." (*See id*,; R2951, ECF No. 89-4).  In short, they are based on generally accepted standards of medical practice.  While Plaintiffs argue that "proof of the development processes, without more, is insufficient to show that a guideline is [Parity Act] compliant," (ECF No. 87 at 19), this argument impermissibly attempts to shift Plaintiffs' burden of proof to Defendants.  To defend against Plaintiffs' Parity Act claim, Defendants need not prove that their guidelines comply

---

[15]  Rather than analyze Anthem's guidelines for evaluating treatment at a Skilled Nursing Facility, Plaintiffs simply note that "Anthem does not dispute that it applies generally accepted standards of care when it evaluates medical and surgical benefits." (ECF No. 87 at 18).  Such a conclusory assertion is too clever by half and cannot be used to carry Plaintiffs' burden to show "a disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog." *Nancy S.*, 2020 WL 2736023, at *3.

with generally accepted standards of medical practice; Plaintiffs must prove that they do not. They have failed to do so.

First, the Plan's guidelines do not limit treatment at a Residential Treatment Center to only short-term durations. The applicable guidelines here incorporate the Plan's definition of medical necessity, which in relevant part, requires that "[t]here should be a reasonable expectation that the illness, condition or level of functioning will be stabilized and improved and that a *short term*, subacute residential treatment service will have a likely benefit on the behaviors/symptoms that required this level of care, and that the member will be able to return to outpatient treatment." (ECF Nos. 72-52, 72-53, 72-54, & 72-55 (emphasis added)). Such language does not limit treatment to only short-term stays; it merely suggests that treatment *should* be *reasonably expected* to improve a patient's condition in a short term. Plaintiffs have failed to establish that this passive language mandates that any long-term stays must be denied. Further, and contrary to Plaintiffs' assertions, the length of M's stay at Maple Lake was not a factor in why coverage for her Treatment was denied.[16] Plaintiffs have therefore failed to establish that even if the court accepts *Wit's* guidance, the Plan or Anthem's guidelines limit treatment at Residential Treatment Centers to only short-term durations.

Plaintiffs' second argument centers on their assertion that in determining that M's Treatment was not medically necessary, Anthem "had to ignore or minimize the safety risk that M. posed if she were to not receive sub-acute inpatient treatment at the residential treatment level." (ECF No. 74 at 29–30). Even if the court accepts *Wit's* indications that such consideration is necessary, as discussed above, the Record does not support a finding that M posed a safety risk outside of residential treatment. Prior to her admission, M's mother stated that she had not been

---

[16] *See supra* Note 10.

violent (*see* R2189, ECF No. 72-49), and that any self-harm that she had engaged in had been "superficial." (R2586, ECF No. 72-50). Further, and as discussed above, each incident where M was violent at Maple Lake resulted from her difficulty in following the rules imposed on her. Because the Record establishes that M did not pose a safety risk that necessitated twenty-four-hour residential treatment, Plaintiffs cannot establish that Anthem improperly ignored or minimized that risk in violation of generally accepted standards of medical practice.

Because Plaintiffs cannot satisfy the third prong of either of its claims that Defendants violated the Parity Act, Defendants are **ENTITLED TO SUMMARY JUDGMENT** on Plaintiffs' Parity Act Claim.

### IV. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON EITHER OF THEIR CLAIMS.

As noted above, "[c]ross-motions for summary judgment are to be treated separately," and "the denial of one does not require the grant of another." *Buell Cabinet Co.*, 608 F.2d at 433. As such, the court now turns to Plaintiffs' Motion for Summary Judgment, which asks the court to grant them summary judgment on both their ERISA and Parity Act Claims.

#### A. ERISA Claim.

To prevail on their ERISA Claim, Plaintiffs bear the burden "to establish a covered loss." *LaAsmar*, 605 F.3d at 800. To do so, they must establish that M's Treatment was medically necessary. (*See* R48, ECF No. 72-1). As discussed above, the Record establishes that M was not at a risk for serious harm. As such, Plaintiffs cannot establish that her Treatment was medically necessary. Their request for summary judgment on their ERISA Claim is therefore **DENIED**.

#### B. Parity Act Claim.

To prevail on their Parity Act Claim, Plaintiffs must "(1) identify a specific treatment limitation on mental health benefits, (2) identify medical/surgical care covered by the plan that is analogous to the mental health/substance abuse care for which the plaintiffs seek benefits, and (3)

plausibly allege a disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog." *Nancy S.*, 2020 WL 2736023, at *3 (internal quotations and citations omitted). As discussed above, Plaintiffs have failed to establish this final factor, as they have not identified a disparity that Defendants applies to treatment limitations on mental health benefits compared to analogous medical/surgical treatment. Because Plaintiffs have failed to establish each element of their Party Act Claim, their request for summary judgment on their Parity Act Claim is **DENIED**.

### C. Request for Fees.

Because Plaintiffs cannot prevail on either their ERISA or Parity Act Claims, they are not entitled to recover the fees requested in their Amended Complaint. Their request for fees is therefore **DENIED**.

**CONCLUSION**

For the reasons stated above, the court **HEREBY GRANTS** Defendants' Motion for Summary Judgment (ECF No. 73) and **DENIES** Plaintiffs' Motion for Summary Judgment (ECF No. 74).

DATED this 21st day of June, 2021.

BY THE COURT:

Clark Waddoups
United States District Judge